IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

NO. 23-2396
CRIMINAL

_____

UNITED STATES OF AMERICA,
Appellee,
v.
MARCUS MILLSAP
Appellant

_____

Appeal from the United States District Court
for the Eastern District of Arkansas

The Honorable Brian S. Miller
United States District Judge

_____

BRIEF OF APPELLEE

_____

JONATHAN D. ROSS
United States Attorney
Eastern District of Arkansas

STEPHANIE MAZZANTI
Assistant U.S. Attorney
P. O. Box 1229
Little Rock, Arkansas 72203
501-340-2600

Attorneys for Appellee

# SUMMARY OF THE CASE

On February 5, 2019, Marcus Millsap was charged with conspiracy to violate RICO, aiding and abetting attempted murder in aid of racketeering, and conspiracy to distribute and possess with intent to distribute methamphetamine. He was found guilty on all counts following a jury trial and sentenced to life imprisonment.

Millsap appeals, arguing that the district court erred by denying a motion to dismiss the indictment and denying a motion for a mistrial. He also alleges that the evidence was insufficient to support his convictions and that the district court committed evidentiary errors at trial and errors at sentencing.

If oral argument is ordered, the United States respectfully requests the same time granted to Millsap.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE.......................................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ................................................................ iii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUE...............................................................2

STATEMENT OF THE CASE ................................................................4

SUMMARY OF THE ARGUMENT .....................................................11

ARGUMENT ......................................................................................12

CONCLUSION....................................................................................64

CERTIFICATION OF COMPLIANCE ................................................65

CERTIFICATE OF SERVICE .............................................................66

Appellate Case: 23-2396    Page: 3    Date Filed: 01/17/2024 Entry ID: 5354081

# TABLE OF AUTHORITIES

## CASES

*Baxter v. United State*s, 966 F.2d 387 (8th Cir. 1992) .......................................2, 14

*Greathouse v. United States*, 655 F.2d 1032 (10th Cir. 1981) ..............................15

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) ..............................................25

*Johnson v. Williams*, 666 F.2d 842 (3d Cir. 1981) ................................................14

*New York v. Hill*, 528 U.S. 110 (2000) ...................................................................12

*Pinkerton v. United States*, 328 U.S. 640 (1946) ...............................25, 29, 31, 33

*Prowse v. Payne*, 984 F.3d 700 (8th Cir. 2021) ................................................3, 63

*Remmer v. United States*, 347 U.S. 227 (1954) .....................................................51

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) .......................................................24

*Salinas v. United States*, 522 U.S. 52 (1997) ........................................................25

*Schumacher v. United States*, 216 F.2d 780 (8th Cir. 1954) ................................49

*United States v. Anderson*, 618 F.3d 873 (8th Cir. 2010) .....................................53

*United States v. Arrington*, 867 F.2d 122 (2d Cir. 1989) ......................................42

*United States v. Atkins*, 250 F.3d 1203 (8th Cir. 2001) .........................................53

*United States v. Banks*, 514 F.3d 959 (9th Cir. 2008) ...........................................47

*United States v. Benson*, 888 F.3d 1017 (8th Cir. 2018) .......................................61

*United States v. Brady*, 26 F.3d 282 (2d Cir. 1994) ..............................................30

iii

*United States v. Brown*, 923 F.2d 109 (8th Cir. 1991)  .......................................2, 51

*United States v. Bruno,* 383 F.3d 65 (2d Cir. 2004)  ..............................................29

*United States v. Burch*, 809 F.3d 1041 (8th Cir. 2016)  .........................................34

*United States v. Burks*, 135 F.3d 582 (8th Cir. 1998)  ...........................................28

*United States v. Byas*, 581 F.3d 723 (8th Cir. 2009)  ............................................55

*United States v. Cartwright*, 23 F.4th 1075 (8th Cir. 2022)  ................................23

*United States v. Crenshaw*, 359 F.3d 977 (8th Cir. 2004)  ...................................45

*United States v. Darden*, 70 F.3d 1507 (8th Cir. 1995)  2, 26, 27, 35, 36, 40, 43, 45

*United States v. Davis*, 457 F.3d 817 (8th Cir. 2006)  .......................................2, 35

*United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001)  .........................................29

*United States v. Diaz–Pellegaud*, 666 F.3d 492 (8th Cir. 2012)  ..........................50

*United States v. Dooley*, 580 F.3d 682 (8th Cir. 2009)  .........................................12

*United States v. Espinoza*, 684 F.3d 766 (8th Cir. 2012)  .................................39, 45

*United States v. Fulford*, 825 F.2d 3 (3d Cir. 1987)  .............................................15

*United States v. Gaines*, 859 F.3d 1128 (8th Cir. 2017)  .......................................48

*United States v. Gardner*, 447 F.3d 558 (8th Cir. 2006)  ......................................36

*United States v. Gomez-Diaz*, 911 F.3d 931 (8th Cir. 2018)  ................................50

*United States v. Guerra*, 113 F.3d 809 (8th Cir. 1997)  ........................................35

*United States v. Harris*, 493 F.3d 928 (8th Cir. 2007)  .........................................55

iv

*United States v. Harris*, 695 F.3d 1125 (10th Cir. 2012) ...................................24

*United States v. Haynie*, 75 F.4th 971 (8th Cir. 2023) ...........................................58

*United States v. Heilman*, 377 F. App'x 157 (3d Cir. 2010) ................................29

*United States v. Henley*, 766 F.3d 893 (8th Cir. 2014) .............2, 25, 26, 28, 30, 34

*United States v. Hernandez Lopez*, 24 F.4th 1205 (8th Cir. 2022) ......................56

*United States v. Hester*, 140 F.3d 753 (8th Cir. 1998) ...........................................46

*United States v. Hoelscher*, 914 F.2d 1527 (8th Cir. 1990) ..................................33

*United States v. Hogue*, 66 F.4th 756 (8th Cir. 2023) ........................................3, 62

*United States v. Iwuamadi*, 716 F. Supp. 420 (D. Neb. 1989) ..............................15

*United States v. Iwuamadi*, 909 F.2d 509 (8th Cir. 1990) ....................................15

*United States v. Jefferson*, 215 F.3d 820 (8th Cir. 2000) ......................................39

*United States v. Jones*, 195 F.3d 379 (8th Cir. 1999) ........................................2, 60

*United States v. Jordan*, 260 F.3d 930 (8th Cir. 2001) .........................................36

*United States v. Kehoe*, 310 F.3d 579 (8th Cir. 2002) .....................................23, 28

*United States v. Lemon*, 239 F.3d 968 (8th Cir. 2001) ..........................................47

*United States v. Lomeli*, 596 F.3d 496 (8th Cir. 2010) ..........................................61

*United States v. Lopez*, 416 F.3d 713 (8th Cir. 2005) .......................................53, 55

*United States v. Macomber*, 717 F.3d 607 (8th Cir. 2013) ...................................22

*United States v. Marino*, 277 F.3d 11 (1st Cir. 2002) ...........................................24

v

*United States v. Marrone*, 48 F.3d 735 (3d Cir. 1995) ...........................................58

*United States v. Mathis*, 216 F.3d 18 (D.C. Cir. 2000) ...........................................47

*United States v. Mauro*, 436 U.S. 340 (1978) .......................................2, 12, 14, 15

*United States v. McKay*, 431 F.3d 1085 (8th Cir. 2005) .................................20, 37

*United States v. McKenzie*, 79 F.4th 924 (8th Cir. 2023) .....................................60

*United States v. McKinney*, 395 F.3d 837 (8th Cir. 2005) ....................................21

*United States v. Miller*, 698 F.3d 699 (8th Cir. 2012) ......................................2, 55

*United States v. Muyet*, 994 F. Supp. 550 (S.D.N.Y. 1998) ..................................31

*United States v. Petruk*, 929 F.3d 952 (8th Cir. 2019) ...........................................34

*United States v. Pierce*, 479 F.3d 546 (8th Cir. 2007) ...........................................32

*United States v. Pierre*, 870 F.3d 845 (8th Cir. 2017) ...........................................59

*United States v. Randall*, 661 F.3d 1291 (10th Cir. 2011) ....................................26

*United States v. Rastelli*, 870 F.2d 822 (2d Cir. 1989) ....................................24, 26

*United States v. Renteria-Saldana*, 755 F.3d 856 (8th Cir. 2014) ........................53

*United States v. Rich*, 14 F.4th 489 (6th Cir. 2021) ..............................................24

*United States v. Rios*, 830 F.3d 403 (6th Cir. 2016) ..............................................47

*United States v. Roy*, 771 F.2d 54 (2d Cir. 1985) ...........................................14, 15

*United States v. Sadler*, 864 F.3d 902 (8th Cir. 2017) ..........................................61

*United States v. Savage*, 414 F.3d 964 (8th Cir. 2005) .....................................2, 52

Appellate Case: 23-2396    Page: 7    Date Filed: 01/17/2024 Entry ID: 5354081

*United States v. Scott*, 64 F.3d 377 (8th Cir. 1995) ..........................................33, 34

*United States v. Sims*, 999 F.3d 547 (8th Cir. 2021) ............................................36

*United States v. Stone*, 325 F.3d 1030 (8th Cir. 2003) ...........................................52

*United States v. Tse*, 375 F.3d 148 (1st Cir. 2004) ...............................................47

*United States v. Turpin*, 920 F.2d 1377 (8th Cir. 1990) .........................................54

*United States v. Tyerman*, 701 F.3d 552 (8th Cir. 2012) .......................................27

*United States v. Wallette*, 686 F.3d 476 (8th Cir. 2012) ...................................2, 50

*United States v. Whitten,* 610 F.3d 168 (2d Cir. 2010) ...........................................30

*United States v. Williams*, 974 F.3d 320 (3d Cir. 2020) ........................................34

*United States v. Winnick*, 954 F.3d 1103 (8th Cir. 2020) ......................................60

*United States v. Woods*, 717 F.3d 654 (8th Cir. 2013) ......................................2, 59

*United States v. Woods*, 775 F.2d 1059 (9th Cir. 1985) .........................................14

*United States v. Wright*, 739 F.3d 1160 (8th Cir. 2014) ...................................39, 42

*United States v. Young*, 753 F.3d 757 (8th Cir. 2014) .....................................38, 41

## <u>STATUTES</u>

18 U.S.C. § APP. 2 § 2, art. III ...............................................................................13

18 U.S.C. § 2 ......................................................................................................4, 29

18 U.S.C. § 1959 ......................................................................................................4

18 U.S.C. § 1961 ....................................................................................................25

Appellate Case: 23-2396    Page: 8    Date Filed: 01/17/2024 Entry ID: 5354081

18 U.S.C. § 1962 ........................................................................4, 24

18 U.S.C. § 3161 ..............................................................................4

18 U.S.C. § 3231 ..............................................................................1

18 U.S.C. § 3553 ............................................................................61

21 U.S.C. § 846 ................................................................................4

28 U.S.C. § 1291 ..............................................................................1

## **RULES**

Federal Rule of Evidence Rule 801 .........................................35

## **GUIDELINES**

U.S.S.G. § 1B1.2 .............................................................................53

U.S.S.G. § 2D1.1 ..........................................................53, 55, 56

U.S.S.G. § 2E1.1 ............................................................................58

U.S.S.G. § 4A1.1 ...........................................................................59

U.S.S.G. § 4A1.2 ...........................................................................58

U.S.S.G. § 5G1.3 ......................................................11, 59, 60, 61

Appellate Case: 23-2396     Page: 9     Date Filed: 01/17/2024 Entry ID: 5354081

# **JURISDICTIONAL STATEMENT**

The district court had jurisdiction under 18 U.S.C. § 3231. Judgment was entered on May 26, 2023. Millsap appealed on June 7, 2023. This Court has jurisdiction under 28 U.S.C. § 1291.

Appellate Case: 23-2396     Page: 10     Date Filed: 01/17/2024 Entry ID: 5354081

## STATEMENT OF THE ISSUE

I. THE DISTRICT DID NOT ERR WHEN IT DENIED MILLSAP'S MOTION TO DISMISS BASED ON A PURPORTED IADA VIOLATION.

*Baxter v. United States*, 966 F.2d 387 (8th Cir. 1992)
*United States v. Mauro*, 436 U.S. 340 (1978)

II. THE EVIDENCE WAS SUFFICIENT TO SUPPORT MILLSAP'S CONVICTIONS.

*United States v. Darden*, 70 F.3d 1507, 1518 (8th Cir. 1995)
*United States v. Henley*, 766 F.3d 893 (8th Cir. 2014)

III. THE DISTRICT COURT DID NOT COMMIT EVIDENTIARY ERROR.

*United States v. Darden*, 70 F.3d 1507 (8th Cir. 1995)
*United States v. Davis*, 457 F.3d 817 (8th Cir. 2006)

IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING MILLSAP'S MOTION FOR A MISTRIAL.

*United States v. Brown*, 923 F.2d 109 (8th Cir. 1991)
*United States v. Wallette*, 686 F.3d 476 (8th Cir. 2012)

V. THE DISTRICT COURT PROPERLY APPLIED THE CHALLENGED SENTENCING ENHANCEMENTS.

*United States v. Miller*, 698 F.3d 699 (8th Cir. 2012)
*United States v. Savage*, 414 F.3d 964 (8th Cir. 2005)

VI. THE DISTRICT COURT DID NOT ERR BY NOT APPLYING U.S.S.G. § 5G1.3 TO MILLSAP'S UNDISCHARGED TERM OF IMPRISONMENT.

*United States v. Jones*, 195 F.3d 379 (8th Cir. 1999)
*United States v. Woods*, 717 F.3d 654 (8th Cir. 2013)

2

VII. THE DISTRICT COURT DID NOT PLAINLY ERR BY CONSIDERING HURLEY'S ATTEMPTED MURDER AT SENTENCING.

*United States v. Hogue*, 66 F.4th 756 (8th Cir. 2023)

VIII. MILLSAP'S CLAIM REGARDING PRETRIAL JAIL CREDIT IS MOOT.

*Prowse v. Payne*, 984 F.3d 700 (8th Cir. 2021)

Appellate Case: 23-2396    Page: 12    Date Filed: 01/17/2024 Entry ID: 5354081

## STATEMENT OF THE CASE

During the relevant period, Millsap was an associate of the New Aryan Empire (NAE), a white-supremacist gang funding its activities through methamphetamine trafficking using its members and associates, including Millsap and members of other white-supremacist groups, such as the White Aryan Resistance (WAR). Millsap worked with the NAE President, Wesley Gullett, trafficking narcotics for the group and funding its drug activities. Millsap also solicited NAE members and associates to murder Bruce Hurley, an informant who had conducted a controlled purchase of methamphetamine from him.

On February 5, 2019, Millsap was charged in the Eastern District of Arkansas with conspiracy to violate RICO (Count 1, 18 U.S.C. § 1962(d)), aiding and abetting attempted murder in aid of racketeering (Count 2, 18 U.S.C. §§ 1959 and 2), and conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine (Count 10, 21 U.S.C. § 846). (R. Doc. 614). At the time, Millsap was incarcerated in the Arkansas Department of Correction (ADC). The district court issued a writ of habeas corpus ad prosequendum, in accordance with 18 U.S.C. § 3161(j)(1), to bring Millsap to arraignment before a magistrate judge on February 19, 2019. (Add. 1; R. Doc. 629, 672, 673, 716). The United States did not lodge a detainer under section 3161(j)(2), which would shift responsibility to the state prison

Appellate Case: 23-2396    Page: 13    Date Filed: 01/17/2024 Entry ID: 5354081

warden to "promptly advise the prisoner of the charge [on which the detainer is based] and of the prisoner's right to demand trial."

Millsap was arraigned, trial was set for March 25, 2019, and the magistrate judge *sua sponte* entered an Order to Lodge Detainer. (Add. 2; R. Doc. 716, 717, 718). On February 20, 2019, the United States Marshal Service (USMS) transmitted the detainer to the ADC. (R. Doc. 926-1). On February 21, 2019, the magistrate judge ordered that Millsap remain in USMS custody pending trial, and he was not returned to the ADC. (Add. 3; R. Doc. 739).

The district court denied Millsap's oral and written motions to dismiss the second superseding indictment based on a purported IADA violation. (Tr. March 9, 2020, 7)[1]; (Add. 4; R. Doc. 1434, 1439, 1443, 1444, 1448). The district court denied the motion for the same reason it denied Gullett's motion under the IADA–because the IADA did not apply to him. (Tr. May 24, 2019, 61, 74-75, 80); (R. Doc. 1004, 1439).[2]

At trial, the United States introduced evidence that NAE was heavily engaged in drug trafficking in Arkansas. Kelly Duncan, an NAE associate and WAR Lieutenant Major, testified that when Gullett became NAE President, "[m]ass

---

[1] "Tr. March 9, 2020" refers to the motion hearing on that date.
[2] "Tr. May 24, 2019" refers to the motion hearing on that date.

Appellate Case: 23-2396    Page: 14    Date Filed: 01/17/2024 Entry ID: 5354081

amount[s]" of drugs began being supplied to NAE and WAR members, and Gullett had large amounts of methamphetamine shipped to Arkansas with Millsap's assistance. (Tr. Vol. 4, 549-51). Millsap was NAE's financial backer and started the drug business with him. (Tr. Vol. 4, 549, 578-79). Millsap assisted Gullett in obtaining methamphetamine, and Millsap paid NAE for protection while in prison. (Tr. Vol. 4, 551, 578). Gullett supplied NAE with methamphetamine with funding from Millsap. (Tr. Vol. 2, 158, 292; Vol. 4, 537, 549, 551; Vol. 5, 896, 905). Millsap funded drugs up front while others "located the product." (Tr. Vol. 4, 578; Vol. 6, 1009; Vol. 9, 1552-1553, 1563). Millsap assisted Gullett in shipping large amounts of methamphetamine from California to Arkansas. (Tr. Vol. 4, 549-51). Millsap and co-conspirators distributed methamphetamine in large quantities, including 30 pounds of methamphetamine from Gullett and co-conspirators. (Tr. Vol. 4, 561-562; Vol. 5, 781-83). Co-conspirator David Singleton testified about the profits NAE President Gullett made from his transactions with Millsap. (Tr. Vol. 9, 1549, 1552, 1557).

Multiple witnesses testified about being at Millsap's home when pound quantities of methamphetamine were trafficked. (Tr. Vol. 4, 632, 636, 639-46, 676, 681-84, 715; Vol. 10, 1728). Several witnesses testified about taking methamphetamine to or obtaining methamphetamine from Millsap at his house and

6

about Millsap storing and distributing methamphetamine with Gullett at his house, including testimony of witnesses observing roughly 20 pounds of packaged methamphetamine in a five-gallon bucket in Millsap's house. (Tr. Vol. 4, 632, 636, 639-46, 676, 681-84, 715; Vol. 9, 1662-63; Vol. 10, 1728).

Millsap had a 2009 conviction for delivery of methamphetamine and threats and retaliation against an informant related to the transaction. (Tr. Vol. 1, 44-46). On May 1, 2014, police officers had informant Bruce Hurley conduct a controlled buy of methamphetamine from Millsap; officers then stopped Millsap's vehicle and found methamphetamine and a large quantity of cash. (Tr. Vol. 1, 55). Millsap admitted to selling methamphetamine and admitted he could obtain a large amount of methamphetamine from Kareem Campbell, a relative of Troy Loadholt and Singleton. (Tr. Vol. 1, 57).

After this incident, Millsap sought to arrange Hurley's murder. Dustin Hurst testified that Millsap told him around Christmas 2014 he wanted Hurley to die for setting him up. (Tr. Vol. 4, 674-75). Gullett informed Duncan that Millsap would provide $50,000 if he would kill the guy that "told on" Millsap, and Millsap again referenced the solicitation when he met with Duncan in a Wal-Mart parking lot. (Tr. Vol. 4, 575-78, 590-93). Joe Morris testified that Millsap said he would pay $10,000 to $20,000 to "see Bruce taken care of" for snitching on him. (Tr. Vol. 4, 717-21).

Appellate Case: 23-2396     Page: 16     Date Filed: 01/17/2024 Entry ID: 5354081

Robert Chandler testified he heard Millsap and Gullett discuss that Hurley "needs to die," that they referenced $10,000, and that Millsap had referred to Hurley as a snitch. (Tr. Vol. 9, 1500-02). Shannon Boyer testified she overheard Millsap tell Scotty Oliver that if Hurley is the one that got him "busted," he (Millsap) would kill Hurley. (Tr. Vol. 4, 644). Shannon Spencer heard Millsap say he was going to have to do something about Hurley during a methamphetamine deal. (Tr. Vol. 8, p. 1346-49). During a conversation with Robert Cody Hall, Gullett stated he was "handling business" for Millsap and indicated that NAE's methamphetamine business money came from Millsap, and the money for NAE's business related to Hurley. (Tr. Vol. 6, 1008-09). Gullett told Hall that Millsap offered Gullett a total of $50,000 ($35,000 directly to Gullett) for a hit on an informant that told on Millsap and NAE was involved in the solicitation. (Tr. Vol. 6, 1011).

NAE member Jeffrey Knox testified about Gullett having financial problems because people were not paying him for the drugs. (Tr. Vol. 2, p. 328). These problems provided motivation for Gullett to be involved in the efforts to murder Hurley. Knox testified that Gullett explained his buddy, "Mark" or "Red"[3], was going to trial on a delivery charge, Hurley had set Millsap up and performed a drug

---

[3] Knox could not recall whether Gullett referred to Millsap as "Mark" or "Red" on that occasion. (Tr. Vol. 3, 333).

Appellate Case: 23-2396    Page: 17    Date Filed: 01/17/2024 Entry ID: 5354081

buy for law enforcement involving Millsap, and Millsap wanted Hurley killed. (Tr. Vol. 3, 328, 333). Knox testified that Gullett said Millsap would pay $30,000 to have Hurley killed. (Tr. Vol. 3, 333).

Knox set up a time for Gullett to go to Hurley's property. (Tr. Vol. 3, 334). Once at Hurley's home, Knox testified Gullett, Hurley, and Knox walked outside to look at the property, although it was dark. (Tr. Vol. 3, 336-37). Hurley walked out first, followed by Knox, and Gullett behind him. (Tr. Vol. 3, 337). At the far end of Hurley's property, Hurley stopped. *Id*. Knox heard something behind him, turned around, and saw Gullett with a gun in his hand pointed at Hurley. *Id*. Knox turned to look at Hurley, who had a gun in his hand, and he turned back to look at Gullett. *Id*. Gullett tried to "jack" the shell in the gun, which had jammed, and Hurley fired his gun. *Id*. Gullett ran to his truck and proceeded up the road, and Knox jumped in the back of the truck as it took off. *Id*. Hurley shot his firearm again, hitting the mirror of Gullett's truck. *Id*. On January 4, 2016, Hurley contacted police after the attempted murder and was advised to call 911 and make a report. (Tr. Vol. 1, 61). Millsap was released on an appeal bond at that time. (Tr. Vol. 1, 58-60).

Millsap's Facebook page friends list included over a dozen NAE and WAR members. (Tr. Vol. 10, 1799-1800; Exhibit 4A). Millsap was depicted in a photo with several other inmates, including NAE and WAR members and associates,

9

making a "Heil Hitler" salute at the Pope County Detention Center. (Tr. Vol. 10, 1795-97; Exhibit 21A). Millsap's tattoos are symbols associated with NAE. (Tr. Vol. 2, 145, 258; Vol. 7, 1263-64, 1266; Vol. 10, 1793-94; Exhibit 56).

During the trial, outside the presence of the jury, the district court advised the parties a court security officer indicated two jurors informed him they were walking up the street the previous day and Millsap's wife, Christy Millsap, was sitting in a truck at the corner, she looked at them, she "kind of looped around in the truck and took off real fast," and the jurors "felt like it was alarming." (Tr. Vol. 7, 1115-16).[4] After declining to make a record, defense counsel later moved for a mistrial based on Christy Millsap's behavior. (Tr. Vol. 7, 1117, 1171-73). The United States noted that there was no information of direct communication or a threat. (Tr. Vol. 7, 1174). The district court denied the motion. (Tr. Vol. 7, 1171-73).

The jury convicted Millsap on all counts. (R. Doc. 2259, 2264). The district court sentenced Millsap to life imprisonment on Counts 1 and 10, and 120 months on Count 2, to run concurrently, and he filed a timely notice of appeal. (Add. 5, 13; R. Doc. 2772, 2776).

---

[4] Mrs. Millsap was previously barred from entering the courtroom. (Tr. Vol. 5, 774-76). In an unrelated incident, two alternate jurors informed court security that as they walked to their car the previous night, "some guy was standing by his car looking menacing." (Tr. Vol. 7, 1116).

10

## SUMMARY OF THE ARGUMENT

The district court did not err by denying Millsap's motion to dismiss the indictment because the IADA does not apply to him, and, even if it did, there was good cause for the continuances sufficient to extend the 120-day period. In any event, dismissal with prejudice would not be appropriate.

The evidence at trial was sufficient to support Millsap's convictions. The district court did not commit evidentiary error. The district court did not abuse its discretion by denying Millsap's motion for a mistrial. The district court properly applied the challenged sentencing enhancements. The district court did not err by not applying U.S.S.G. § 5G1.3, nor did it err by considering Hurley's attempted murder. Millsap's final point is moot.

11

# ARGUMENT

**I.** **The district court did not err when it denied Millsap's motion to dismiss based on a purported IADA violation.**

## A. Standard of Review

This Court reviews a district court's denial of a motion to dismiss an indictment under the Interstate Agreement on Detainers Act (IADA) de novo and reviews the factual findings supporting that decision for clear error. *United States v. Dooley*, 580 F.3d 682, 685 (8th Cir. 2009) (citations omitted).

## B. The IADA does not apply to Millsap.

The IADA does not apply because Millsap was transferred in this case under a writ of habeas corpus ad prosequendum, not a detainer. *United States v. Mauro*, 436 U.S. 340, 359 (1978). The detainer was not delivered to the ADC until after Millsap was in federal custody, and Millsap was not returned to the ADC.

The Interstate Agreement on Detainers "is a compact entered into by 48 States, the United States, and the District of Columbia to establish procedures for resolution of one State's outstanding charges against a prisoner of another State." *New York v. Hill*, 528 U.S. 110, 111 (2000). Article III of the IADA sets forth the three circumstances triggering its application: (1) the federal defendant is a state prisoner; (2) the state prisoner is facing federal criminal charges; and (3) the transfer

12

of a state defendant to federal custody was preceded by lodging a detainer with the state correctional facility. Millsap was a state prisoner facing federal criminal charges. 18 U.S.C. § APP. 2 § 2, art. III(a).

As to the third requirement, Article III of the IADA provides that it applies only where "there is pending in any other party State any untried indictment, information, or complaint on the basis of which a detainer *has been lodged* against the prisoner." *Id*. Subsections (a), (b), and (c) of Article III indicate that to trigger application of the IADA, the prisoner would need to be in a position to receive and be advised of the contents of the detainer by the warden, and thus still incarcerated in the state prison, enabling the defendant the opportunity to take the steps necessary to demand a speedy trial under the IADA. *Id.* ("The warden, commissioner of corrections, or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information, or complaint on which the detainer is based.").

Article IV provides, "In respect of any proceeding made possible by this article, *trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present*, the court having jurisdiction of the matter may

13

grant any necessary or reasonable continuance. *Id.*, art. IV. (emphasis added). Subsection (a) of Article IV references a "prisoner *against whom [the appropriate officer] has lodged* a detainer," indicating that Article IV requires that the detainer must be lodged prior to any transport of a defendant from the state prison. While the detainer ordered to be lodged was transmitted to the ADC on February 20, 2019, Millsap was not returned to the ADC and had already been transported by operation of a writ at that time.

The IADA applies to a state prisoner facing federal charges only if a detainer based on the federal charges was lodged against him *before* he was transferred from state to federal custody. *See Mauro*, 436 U.S. at 351, 361. If no detainer was lodged against the state prisoner before he was transferred to federal custody, the IADA does not apply to him. *Id.*; *Baxter v. United States*, 966 F.2d 387, 389 (8th Cir. 1992).

The Second Circuit has considered the impact of the timing of the writ and detainer, concluding that "the sequence of events determines whether the Agreement applies." *United States v. Roy*, 771 F.2d 54, 58-59 (2d Cir. 1985). In *Roy*, it held that if "a prisoner is initially brought to federal court pursuant to a writ at a time when no detainer has been lodged, the Agreement does not apply." *Id.* at 58 (citation omitted). Other circuits have reached the same conclusion. *See United States v. Woods*, 775 F.2d 1059, 1060 (9th Cir. 1985); *Johnson v. Williams*, 666 F.2d 842 (3d

14

Cir. 1981); *Greathouse v. United States*, 655 F.2d 1032, 1033–34 (10th Cir. 1981); *United States v. Fulford*, 825 F.2d 3, 11 (3d Cir. 1987). The IADA only applies to court appearances occurring after the detainer is lodged, "whether such appearances are arranged under the authority of the detainer or a writ." *Roy*, 771 F.2d at 58-59.

The purpose of the IADA supports the conclusion that a federal detainer provided to a state prison when the prisoner is in federal custody is a non-event. "When the United States obtains state prisoners by means of a writ of habeas corpus *ad prosequendum*, the problems that the [IADA] seeks to eliminate do not arise[.]" *Mauro*, 436 U.S. at 361. "Unlike writs of habeas corpus ad prosequendum, detainers can be lodged without court supervision and never expire; this in turn may adversely impact the rehabilitation of prisoners because the prisoner and prison officials can never be certain of the inmate's status unless and until the inmate is tried on the charges underlying the detainer." *United States v. Iwuamadi*, 716 F. Supp. 420, 420 (D. Neb. 1989), *aff'd*, *United States v. Iwuamadi*, 909 F.2d 509 (8th Cir. 1990) (unpublished). "On the other hand, writs of habeas corpus ad prosequendum are court supervised, have limited duration, and since all prisoners are potentially subject to the writ of habeas corpus ad prosequendum, the potentiality for the issuance of the writ is not likely to adversely impact upon an individual inmate of the prison system." *Id*.

15

Here, the entire process regarding Millsap was supervised by the district court, rather than Millsap being impacted by an administrative detainer while incarcerated in the ADC without access to the federal court. (Tr. May 24, 2019, 50) (noting the policy reasons for the IADA are not applicable because if a defendant is "not in the ADC, then he can't lose any privileges of the ADC"). In fact, the United States did not send the detainer to the ADC of its own choosing; rather, the court *sua sponte* ordered the detainer. Thus, providing the detainer cannot be attributed to the United States. The district court properly denied Millsap's motion to dismiss because the IADA did not apply to Millsap.

### C. Even if the IADA applied to Millsap, there was good cause for the continuances sufficient to extend the 120-day period.

On March 7, 2019, prior to any attempt by Millsap to invoke the speedy trial provisions of the IADA, the district court continued the trial to October 28, 2019. (R. Doc. 842). On March 13, 2019, Millsap filed a motion asking the district court to set aside its order that he be kept in USMS custody and return him to custody of the ADC. (R. Doc. 871, 893, 914). At a March 28, 2019, hearing on Millsap's motion, the court asked the parties to address whether the IADA had been triggered, and the United States filed a response. (R. Doc. 918, 941). On April 23, 2019, the magistrate judge denied Millsap's request to go back to the ADC pending trial

16

acknowledging that "[a]rguably, the IADA does not apply," but declining to decide that issue. (R. Doc. 956).

On May 13, 2019, the United States moved to determine applicability of the IADA arguing that the IADA did not apply to Millsap, and alternatively, to reset the trial date to a date before June 18, 2019, and schedule a hearing. (R. Doc. 984). Millsap objected to the district court determining whether the IADA applied, arguing that it would constitute an advisory opinion. (R. Doc. 1002).

During a hearing on May 24, 2019, the United States noted that it was attempting to protect Millsap's rights by requesting a hearing and bringing him before the Court and that it was not seeking an advisory opinion because whether the IADA applies impacted the trial date and appropriate procedures. (Tr. May 24, 2019, 35, 45-47). Millsap asserted that all he "has ever wanted would be to be returned to the ADC." (Tr. May 24, 2019, 52). When the district court ruled that it declined to determine whether the IADA applied in light of Millsap's objection, the United States made an oral motion to move the current trial date to a date prior to June 18, 2019, before expiration of the potential IADA speedy trial time, without conceding that the IADA applied. (Tr. May 24, 2019, 65-66); (R. Doc. 1004). Millsap objected to any modification of the October 28, 2019, trial date to bring the trial date within the IADA speedy trial limitations period. (Tr. May 24, 2019, 71, 73-

Appellate Case: 23-2396    Page: 26    Date Filed: 01/17/2024 Entry ID: 5354081

74). Millsap's refusal to agree to accept a trial date within the speedy trial period he claimed applied constitutes a waiver. *Hill*, 528 U.S. at 114.

Rather than proceed with trial the following week as suggested by the district court, the United States moved to continue Millsap's trial date to October 28, 2019, for good cause, including that Millsap's co-conspirators were set for trial on that date and severance was inappropriate, no motion to sever had been filed, for purposes of judicial economy and the interest of justice, the voluminous nature of discovery, the need to conduct plea hearings for certain cooperators, and defense counsel's emails that led the United States to believe Millsap did not object to a continuance. (Tr. May 24, 2019, 66-67, 70). The district court explicitly found that there was good cause for a continuance to October 28, 2019, under the IADA if it applied. (Tr. May 24, 2019, 73); (R. Doc. 1004, 1005).

Contrary to Millsap's assertions, there was no ruse by the United States. The United States took every action possible to clarify the applicable standard, secure Millsap's timely appearance in federal court, and ensure Millsap had the opportunity to litigate application of the IADA and the speedy trial issue. (Tr. May 24, 2019, 35, 45-47). However, instead of pursuing a trial date within his alleged IADA speedy trial period, he affirmatively objected not only to moving the trial to an earlier date

so that he could later file a motion to dismiss, but also to the district court issuing a decision on application of the IADA.

On September 11, 2019, the United States and 43 defendants filed a joint motion to continue the trial and to designate the matter a complex case, with three additional defendants having no objection, noting the positions of other defendants and Millsap's objection. (R. Doc. 1135). In the motion, the United States specifically requested a hearing regarding the motion to continue because the district court declined to rule on the applicability of the IADA. (R. Doc. 1135, 9). In support of good cause for the continuance request, the motion explained that the court had just appointed a Coordinating Discovery Attorney for defense counsel, motions had been filed and ruled upon by the court, a co-defendant escaped from custody, a threat issue required a member of the prosecution team to temporarily relocate out-of-state and prohibited another from traveling to Arkansas, a Second Superseding Indictment was filed, two defendants were fugitives, the United States had been unable to secure the appearance of a defendant in California, Millsap and other defendants were subject to state sentences of imprisonment, one defendant was in the hospital, and multiple counsel had conflicts with the current trial setting. (R. Doc. 1135).

On September 12, 2019, the district court continued the trial to March 23, 2020, finding that "to the extent the Speedy Trial Act governs his case, a continuance

19

is granted because it is in the interest of justice, and the period of delay is excluded for reasons set forth" in the order, and if the IADA applies, "the resulting delay is excluded because it is reasonable and necessary and there is good cause for the reasons set forth." (R. Doc. 1142). The district court noted the complexity of the case and facts, the number of defendants, voluminous discovery, many questions of law, need for time for effective preparation, lack of severance, and that the continuance satisfied the ends of justice and outweighed any interest in a speedy trial. (R. Doc. 1142). The district court cited *United States v. McKay*, 431 F.3d 1085, 1092 (8th Cir. 2005), in which this Court recognized that the district court's finding that the continuance was necessary to serve the ends of justice "meant that the delay did not count toward the limits in either the Speedy Trial Act or the IAD."

With respect to the district court's failure to hold a hearing as requested by the United States as a precaution in the event the IADA applied, the district court had declined to determine whether the IADA applied at Millsap's urging, which constituted a waiver by Millsap. If the IADA did not apply, no hearing would be necessary. Although represented by counsel familiar with the IADA, Millsap did not file an objection to the court's order after it was entered, nor did he file a motion to conduct a hearing. The district court's declination to conduct the hearing requested

20

cannot be attributed to the United States, and considering there was good cause for the continuance, does not support dismissal.

### D. Dismissal

Although the IADA did not apply to Millsap and there was no violation of Millsap's speedy trial rights, even if there had been, Millsap's argument that the district court should have dismissed the indictment with prejudice fails. In determining whether dismissal with or without prejudice is appropriate, the Court considers three factors: (1) the seriousness of the offense; (2) the facts and circumstances leading to the dismissal; and (3) the impact of re-prosecution on the administration of the IADA and on the administration of justice. *United States v. McKinney*, 395 F.3d 837, 840 (8th Cir. 2005).

The seriousness of the offense depends in part upon "the nature of the conduct charged and the potential sentence." *Id.* at 841. Millsap was charged with a RICO conspiracy involving soliciting the murder of a confidential informant and a methamphetamine conspiracy involving significant quantities of drugs, both of which carried a maximum penalty of life, along with attempted murder in aid of racketeering with a maximum sentence of up to ten years. Millsap's conduct was serious.

Appellate Case: 23-2396    Page: 30    Date Filed: 01/17/2024 Entry ID: 5354081

As to the other factors, Millsap cannot demonstrate bad faith or a pattern of negligence by the United States. *See United States v. Macomber*, 717 F.3d 607, 611 (8th Cir. 2013). The United States made good faith efforts to promptly obtain a ruling on the applicability of the IADA and successfully moved to reset the trial date within the 120-day period despite Millsap's objection, the district court appropriately found good cause for each continuance, no severance had been granted and many defendants were pending trial at the time, and the United States requested Millsap be brought to court. (Tr. May 24, 2019, 65). Contrary to Millsap's claim that he requested that the Court set trial for a date certain within the 120-day period, Millsap took the position that "I don't think we have to commit to a date," then asked the court whether it was setting it for a date certain, and finally objected to modifying the trial date asserting the United States was "stuck." (Tr. May 24, 2019, 69-71). Importantly, the detainer was not sent to ADC at the behest of the United States; rather, the court *sua sponte* ordered it. The fact that Millsap was not returned to ADC was due at least in part to security concerns with Millsap and circumstances of his own making. Millsap cannot articulate any prejudice suffered where he was never returned to the ADC and had the opportunity to participate in a re-entry program while detained pretrial. In support of dismissal with prejudice, Millsap relies on alleged deterrent effect; however, "[a]llowing reprosecution where there was no

22

prosecutorial misconduct does not undermine the IADA." *United States v. Cartwright*, 23 F.4th 1075, 1079 (8th Cir. 2022).

The district court properly denied Millsap's motion to dismiss because the IADA does not apply to Millsap, as he was transferred under a writ of habeas corpus ad prosequendum, the detainer order by the court was not delivered to the ADC until after Millsap was in federal custody, and Millsap did not return to the ADC. Even if it applied, the district court properly continued the trial for good cause and there was no violation of the IADA, and even if there was, dismissal without prejudice would be appropriate because there was no prosecutorial misconduct or bad faith.

## II. The evidence was sufficient to support Millsap's convictions.

### A. Standard of Review

This Court will review "the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict" and will reverse the verdict "only if 'no reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Kehoe*, 310 F.3d 579, 586 (8th Cir. 2002) (citations omitted).

23

## B. Conspiracy to Violate RICO

Millsap argues there was insufficient evidence to show he was associated with NAE.[5] Under 18 U.S.C. § 1962(c), a person is associated with an enterprise if he knowingly participates, directly or indirectly, in the conduct of the affairs of an enterprise. To "associate" with an enterprise, one need not have an official position in the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). "Associated" means to be joined, often in a loose relationship, as a partner, fellow worker, colleague, friend, companion, or ally. *See United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002). The defendant need not have "significant control" over or within the enterprise—only "*some* part in directing the enterprise's affairs." *Reves*, 507 U.S. at 179. The defendant need not participate in all activities of the enterprise, have full knowledge of all the activities of the enterprise or participation of all other members of the enterprise, or formally align himself with the enterprise and need only "know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989).

---

[5] Multiple circuits have held that the government need not prove that the enterprise was established or that the defendant was employed or associated with the enterprise. *United States v. Harris*, 695 F.3d 1125, 1132 (10th Cir. 2012); *United States v. Rich*, 14 F.4th 489, 493 (6th Cir. 2021).

24

There is more than substantial evidence to show that Millsap was associated with NAE. The organization's stock in trade is drugs. Multiple witnesses testified regarding Millsap's involvement in the organization's drug activities, including his role in financing them. Further, he used the organization for protection in prison and in his efforts to have a confidential informant against him killed. There is no question that, based on the evidence, Millsap was associated with NAE.

Millsap also joined in an agreement or understanding to participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity. A "pattern of racketeering activity" must include "at least two acts of racketeering activity" occurring within ten years of each other. 18 U.S.C. § 1961(5); *United States v. Henley*, 766 F.3d 893, 907 (8th Cir. 2014). The government must show that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co*., 492 U.S. 229, 239 (1989). The criminal acts are related if they are shown to "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id*. at 240.

A RICO conspiracy operates broadly and does not require that the conspirator agreed to personally commit or facilitate the substantive offense. *Salinas v. United States*, 522 U.S. 52, 63 (1997). Adopting liability under *Pinkerton v. United States*,

25

328 U.S. 640, 646 (1946), the Supreme Court has observed that "[t]he partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." *Id.* at 63-64.

No overt act is required to satisfy a RICO conspiracy. *Id.* at 64. The government was not required to prove that each conspirator agreed that he would be the one to commit two predicate acts or prove the defendant "himself commit[ted] or agree[d] to commit the two or more predicate acts requisite" to a RICO conspiracy conviction; the "conspiracy may exist even if a conspirator does not commit or facilitate each and every part of a substantive offense[.]" *Id.* at 65-66. Thus, it is not necessary to prove that any defendant committed any substantive RICO violation as a result of the conspiracy. *See United States v. Randall*, 661 F.3d 1291, 1297 (10th Cir. 2011). Nor is it required to allege that the defendants agreed to personally commit specific racketeering acts. *Henley*, 766 F.3d at 908.

The agreement to violate the RICO statute need not be express, but "the government need only establish a tacit understanding between the parties[.]" *United States v. Darden*, 70 F.3d 1507, 1518 (8th Cir. 1995) (citations omitted). To establish sufficient knowledge of the conspiracy, it is only required that the defendant "know the general nature of the conspiracy and that the conspiracy extends beyond his individual role." *Rastelli*, 870 F.2d at 828. Furthermore, elements of a conspiracy

26

offense may be proved completely by circumstantial evidence. *Darden*, 70 F.3d at 1518.

Millsap argues there was no evidence he had knowledge of someone committing at least two predicate racketeering acts and that he was simply a drug addict who did not know many conspiracy members. This claim is simply wrong, considering the evidence submitted at trial. Millsap himself engaged in far more than the two required acts of racketeering: he engaged in multiple separate acts tied to drug distribution—receiving and giving others drugs, as well as fronting money for the organization's drug activities—and he solicited multiple people on separate occasions to murder Hurley.

### C.    Attempted Murder in Aid of Racketeering

Millsap argues there was no proof he was connected to the attempted shooting of Hurley on January 4, 2016, or that he took any substantial step to accomplish it. "Attempt requires an intent to commit the predicate offense and conduct that is a substantial step towards the crime's commission." *United States v. Tyerman*, 701 F.3d 552, 566 (8th Cir. 2012) (citation omitted). "A defendant takes a 'substantial step' when he takes actions 'necessary to the consummation of the crime that were of such a nature that a reasonable observer, viewing the actions in context could conclude that the actions were undertaken in accordance with a design to commit

27

the actual offense.'" *Id*. (citation omitted). "A substantial step goes beyond mere preparation but may be less than the last act necessary before commission of the substantive crime." *United States v. Burks*, 135 F.3d 582, 583 (8th Cir. 1998) (citation omitted).

The testimony of Jeff Knox, corroborating testimony of several other witnesses, and ample circumstantial evidence provided considerable, sufficient evidence that Gullett and Knox, aided and abetted by one another and Millsap, attempted to murder Bruce Hurley on or about January 4, 2016. Millsap's argument "ignores the considerable evidence" of Millsap's intention to kill Hurley and the steps he took to attempt to do so. *Henley*, 766 F.3d at 910.

Millsap argues that Knox's testimony should be disregarded because Knox described the person financing Hurley's murder as doing so to avoid a trial for state charges whereas Millsap had conditionally pled guilty to state charges. However, there was extensive, credible testimony by Knox and multiple other witnesses that Millsap was the individual seeking to pay for Hurley's murder, Millsap was on an appeal bond, and it is for the jury to assess the credibility of witnesses. *Kehoe*, 310 F.3d at 592.

Millsap committed or aided and abetted the commission of the crime of attempted first degree murder for the purpose of gaining entrance to the enterprise,

28

or maintaining or increasing his position in the enterprise, or assisting another person to gain entrance to the enterprise, or maintain or increase his position in the enterprise.[6] "[C]ourts have noted when acts are committed or sanctioned by high-ranking members to protect enterprise operations and to advance objectives of enterprise, or where one or more leaders committed the acts in response to a threat posed to the enterprise and to prevent the leaders' positions from being undermined, but not where acts were 'purely mercenary' or defendant was neither a member of the enterprise nor involved in its criminal activity." *United States v. Heilman*, 377 F. App'x 157, 205 (3d Cir. 2010) (citing *United States v. Bruno,* 383 F.3d 65, 83 (2d Cir. 2004)). "The maintenance concept also applies to high-ranking members of enterprises if they are expected to act and failure to do so would undermine their position in the enterprise." *Id*. *See also United States v. Dhinsa*, 243 F.3d 635, 670-72 (2d Cir. 2001) (rejecting defendant's argument that his crimes could not have been committed to maintain or enhance his position in the enterprise because he was the leader of the enterprise, and the evidence established that he committed these crimes to protect his criminal enterprise by murdering and threatening to murder

---

[6] The Second Superseding Indictment alleged an aiding and abetting theory of liability under 18 U.S.C. § 2. In the alternative, the United States relied on co-conspirator liability under *Pinkerton*, 328 U.S. at 645-47.

29

persons he suspected were cooperating with the authorities and failure to retaliate would have undermined his position in the enterprise).

The purposes set forth in the fifth element need not be Millsap's only purpose, or even his primary purpose, for his involvement in the attempted murder. *Henley*, 766 F.3d at 910 (citing *United States v. Whitten,* 610 F.3d 168, 178–79 (2d Cir. 2010)). Millsap did not have to be a member of the enterprise for him to be found guilty of attempted murder in aid of racketeering; it is sufficient for him to have been an associate of the enterprise. *See United States v. Brady*, 26 F.3d 282, 289–90 (2d Cir. 1994).

Contrary to Millsap's argument, his motive was not purely personal and based only on threats to his family or the need to eliminate a witness in his state case. Multiple witnesses testified that Millsap was a financial backer for the NAE criminal enterprise's methamphetamine trafficking operation. (Tr. Vol. 4, 578; Vol. 9, 1551-52). Singleton testified about the profits NAE President Gullett made from his transactions with Millsap. (Tr. Vol. 9, 1549, 1552, 1557). Additionally, Millsap was offering a substantial sum of money for Gullett to kill Hurley. There was no evidence that Gullett had any reason, other than for Millsap's protection and benefit, to attempt to kill Hurley; in fact, the testimony established Gullett did not even know Hurley and solicited Knox for an introduction.

30

A reasonable jury could conclude that Gullett was protecting "the economic base of the drug enterprise" and seeking to make additional profits by agreeing to murder Hurley. *See United States v. Muyet*, 994 F. Supp. 550, 556 (S.D.N.Y. 1998) ("a rational jury could infer that Jose Muyet acted to maintain or increase his position in the enterprise from evidence that he committed a violent crime in order to expand or protect the economic base of the drug enterprise"). In *Muyet*, the district court also rejected a sufficiency claim as to a murder committed "to accommodate a drug source of the Nasty Boys and to secure an additional supply for the enterprise." *Id*. The district court found that where defendant Muyet "was the leader of the gang, a rational jury easily could conclude that Jose Muyet ordered and participated in this killing in order to maintain or increase his position in the Nasty Boys." *Id.* Based on all the evidence presented, and that Gullett provided methamphetamine and the ability to earn money to other members of the enterprise for their benefit, a jury could reasonably conclude that access to funds would help Gullett maintain his position in the organization.

Even if there was any question as to the sufficiency of the evidence under the aiding and abetting theory of liability set forth above, the government presented more than sufficient evidence of Millsap's culpability under a *Pinkerton* theory of liability. To establish liability under *Pinkerton*, the United States was required to

31

establish five elements: *One*, Gullett and Knox committed the crime of attempted murder in aid of racketeering; *Two*, Gullett and Knox were members of the conspiracy at the time the attempted murder in aid of racketeering was committed; *Three*, Gullett and Knox committed the crime of attempted murder in aid of racketeering in furtherance of the conspiracy; *Four*, the attempted murder in aid of racketeering was within the scope of the conspiracy, or was reasonably foreseeable as a necessary or natural consequence of the conspiracy; and *Five*, Millsap was also a member of the conspiracy at the time the attempted murder in aid of racketeering was committed. *United States v. Pierce*, 479 F.3d 546, 550 (8th Cir. 2007).

Knox's testimony and the other corroborating testimony are sufficient to establish the first three elements. As to the fourth element, the attempted murder was within the scope of the conspiracy, as the testimony established that Gullett, the leader of the NAE criminal enterprise, was engaged in a large-scale methamphetamine trafficking operation with NAE members and associates, including Millsap. Gullett solicited an NAE member, Knox, to assist him in the attempted murder, and the attempted murder was discussed the following day with Millsap when Gullett and Singleton went to obtain money in furtherance of the methamphetamine trafficking conspiracy, which was part of the RICO conspiracy. Additionally, as the testimony established that Millsap solicited the murder of

32

Hurley in exchange for money, the attempted murder was reasonably foreseeable as a necessary or natural consequence of the conspiracy. As confirmed by the jury's verdict of guilty as to Count One, the evidence established Millsap was a member of the conspiracy at the time of the attempted murder in aid of racketeering was committed and the attempted murder was both reasonably foreseeable and in furtherance of the conspiracy. Thus, Millsap may be held criminally liable for the actions of his co-conspirators under a *Pinkerton* theory.

### D. Conspiracy to Possess With Intent to Distribute Methamphetamine

Millsap contends the evidence only supported that he sold drugs once in 2014 and that he only engaged in buyer/seller exchanges as a drug user. He fails to explain why substantial testimony to the contrary is insufficient to support his conviction.

Evidence of a formal agreement is not necessary to prove the existence of a conspiratorial agreement, and evidence of a common plan or tacit understanding is sufficient. *United States v. Hoelscher*, 914 F.2d 1527, 1534 (8th Cir. 1990) (citation omitted). For a narcotics conspiracy, a defendant is not required to have full knowledge of all aspects of the conspiracy and can be convicted even if he played only a minor role. *United States v. Scott*, 64 F.3d 377, 381 (8th Cir. 1995). There was extensive testimony at trial that Millsap supplied pound-quantities of methamphetamine to other members of the conspiracy and that he fronted money

33

for co-conspirators to purchase pound-quantities of methamphetamine. The evidence refutes Millsap's claim that the evidence only established he sold drugs on a single occasion and that he was simply a drug user. It also shows that Millsap's relationship with Gullett "went beyond friendship to mutual facilitation of drug trafficking." *United States v. Williams*, 974 F.3d 320, 373 (3d Cir. 2020).

## III.   The district court did not commit evidentiary error.

### A.   Standard of Review

The district court's evidentiary rulings are reviewed for "clear abuse of discretion," "reversing only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." *Henley*, 766 F.3d at 914. This Court gives "due 'deference to the district judge who saw and heard the evidence.'" *United States v. Burch*, 809 F.3d 1041, 1045 (8th Cir. 2016). "In the context of a conspiracy trial, district courts have particularly broad discretion in determining the nature of evidence to be admitted." *Scott,* 64 F.3d at 381.

However, by failing to object at trial to the admission of evidence, a defendant "waive[s] the ability to raise on appeal any evidentiary challenges to the disputed evidence." *United States v. Petruk*, 929 F.3d 952, 958 (8th Cir. 2019). Absent a waiver, the plain error standard of review applies. *Burch*, 809 F.3d at 1046.

34

## B.    Discussion

An out-of-court statement is not hearsay if it is offered against the defendant and is a statement of the defendant's co-conspirator made during the course and in furtherance of the conspiracy. *United States v. Davis*, 457 F.3d 817, 824–25 (8th Cir. 2006). "Whether a statement is made in furtherance of a conspiracy is given broad construction." *United States v. Guerra*, 113 F.3d 809, 814 (8th Cir. 1997).

"For a statement to be admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence (1) that a conspiracy existed, (2) that the declarants were co-conspirators of the defendants, and (3) that the statements were made during the course of and in furtherance of the conspiracy." *Darden*, 70 F.3d at 1528. However, this Court does not require a preliminary hearing to determine the admissibility of co-conspirator statements, and "specifically declined to . . . require[] the government to prove by a preponderance of the evidence, prior to the admission of co-conspirators' statements, that a conspiracy exists." *Darden*, 70 F.3d at 1528.

It is not necessary for the co-conspirator to be "formally charged, or even named, in the conspiracy, 'so long as the statement in question was itself sufficiently reliable in demonstrating the applicability of Rule 801(d)(2)(E).'" *Davis*, 457 F.3d at 825. "In general, statements by coconspirators concerning their distribution of

35

drugs or their efforts to recruit other conspirators are admissible as in furtherance of the conspiracy." *United States v. Gardner*, 447 F.3d 558, 560 (8th Cir. 2006). "Any statement discussing the supply source, identifying a coconspirator's role, indicating the quantity of drugs, or providing information on the enterprise's scope furthers the conspiracy." *United States v. Sims*, 999 F.3d 547, 552 (8th Cir. 2021). Even "statements that describe past events are in furtherance of the conspiracy if they are made to plan future activities" or made "to keep co-conspirators abreast of current developments and problems facing the group." *Darden*, 70 F.3d at 1529. "A statement informing a co-conspirator of the methods of obtaining methamphetamine is admissible because it is designed to help ensure continued involvement." *United States v. Jordan*, 260 F.3d 930, 933 (8th Cir. 2001).

### 1. Knox

Prior to Knox's testimony, the district court addressed the parties regarding the requirements of the co-conspirator exception and Gullett's statements to Knox. (Tr. Vol. 2, p. 226-32). Knox testified that Gullett, the NAE President, went with Knox, an NAE member, and later directed Knox to pick up methamphetamine in California, and that Gullett identified other co-conspirators, including various NAE members and Millsap ("Red") during the drug conspiracy. (Tr. Vol. 3, 300-01, 325-26). There was no question that Knox was a co-conspirator, as he had testified that

36

he pled guilty to the RICO and methamphetamine conspiracy counts, both of which included Gullett and Millsap as co-conspirators, and admitted his conduct regarding the attempted murder of Hurley as part of his guilty plea. (Tr. Vol. 2, 233-34).

Millsap argues that Gullett directing Knox to obtain methamphetamine and advising him of the prior drug transactions with Millsap were merely a recitation of past events. However, Gullett, who obtained money from Millsap and provided him with quantities of the methamphetamine, was keeping Knox, a co-conspirator, abreast of the roles of co-conspirators and scope of the enterprise in discussing his dealings with Millsap. *See McKay*, 431 F.3d at 1093–94. Additionally, the testimony regarding Gullett directing Knox demonstrated their respective roles in the enterprise and the continuation of the enterprise and drug conspiracy for an extended period, even when Gullett was in jail.

Knox also testified that Gullett was low on money, asked Knox to help him contact Hurley, who acted as a confidential informant against Millsap resulting in a drug delivery charge, and advised that Millsap would pay around $30,000 to have Hurley killed. (Tr. Vol. 3, 327, 332-33). Gullett provided $100 to Knox for pills and offered $1,000 for Knox to set up a meeting with Hurley, at which point Gullett attempted to murder Hurley. (Tr. Vol. 3, 334-38). Contrary to Millsap's argument that Millsap's offer to pay for Hurley's death were "casual comments" not in

37

furtherance of the conspiracy, these discussions were the direct precursor and inducement to Knox's involvement in the attempted murder plot and advised Knox of the roles of the co-conspirators. *United States v. Young*, 753 F.3d 757, 771 (8th Cir. 2014).

Knox also testified about Facebook messages from a white supremacist from another Aryan organization asking for an "SOS," which means that "if one of your brothers has a problem with somebody, they can issue an SOS and you are supposed to . . . fight them on sight," and using the term "LLHR," which means "love, loyalty, honor and respect." (Tr. Vol. 2, 278-79). The testimony was not offered for the truth of the matter asserted (*i.e.*, that the "SOS" request was made); rather, it was offered as an example of coordination between, and terminology used by white supremacy organizations.

### 2. Duncan

Kelly Duncan testified that Sheila Lackey offered him money to steal a truck, but he wanted to hear the payer, Millsap, confirm that he was going to pay, which he did. (Tr. Vol. 4, 579-80). After receiving confirmation, Duncan stole the truck, which was brought to Oliver's house, but Lackey went to jail, so Duncan contacted Gullett and Millsap to attempt to get paid with methamphetamine. (Tr. Vol. 4, 581-88). Duncan and Millsap met and agreed that Millsap would provide two pounds of

38

methamphetamine through Gullett when they received the next shipment. (Tr. Vol. 4, 588-89). During that meeting, Millsap directly solicited Duncan to kill Hurley in exchange for $50,000, and Duncan had already been solicited by Gullett on Millsap's behalf. (Tr. Vol. 4, 589-92).

The information about the call from Lackey was not offered for the truth of the matter asserted; it was offered to show the effect on Duncan and as background to explain why Duncan took his subsequent actions. *United States v. Wright*, 739 F.3d 1160, 1170 (8th Cir. 2014). Moreover, Duncan testified that Millsap confirmed the offer of money, a party-opponent admission; any error was harmless. *United States v. Espinoza*, 684 F.3d 766, 781 (8th Cir. 2012).

### 3. Boyer

Shannon Boyer testified that she overhead Gullett tell Oliver, with Knox present, that Gullett missed the shot on Hurley, and Gullett said he would have received $40,000 if he succeeded. (Tr. Vol. 4, 634-36). Gullett, Knox, and Oliver were co-conspirators of Millsap, and the statements were made in furtherance of the conspiracy, as the evidence overwhelmingly established that Gullett and Oliver were actively soliciting the murder of Hurley for Millsap's benefit. *United States v. Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000). Updating Oliver regarding the

39

attempted murder plot and problems encountered during the conspiracy are in furtherance of the conspiracy. *Darden*, 70 F.3d at 1529.

Millsap claims that the only evidence of the attempted murder would have been "Knox's testimony that Gullett fired at Hurley in self-defense only after Hurley fired at him." (App. Br. at 39). However, the testimony of Knox indicated that Knox first heard something behind him where Gullett was walking, he turned to see Gullett pointing a gun at Hurley, then turned back to see Hurley with a gun in his hand, at which point Gullett's gun jammed, Gullett was trying to "jack the shell," and "then Bruce [Hurley] fire[d]." (Tr. Vol. 3, p. 337). Considering Gullett's stated purpose was to kill Hurley, a claim of self-defense is specious. Additionally, there was overwhelming evidence of the attempted murder, including Knox's testimony and multiple corroborating witnesses.

### 4. Fondren

John Fondren testified that a couple of months before May 2016, Oliver offered him $30,000 to kill Hurley and Oliver's source of supply for methamphetamine wanted Hurley dead. (Tr. Vol. 5, 755-760). In response to Fondren asking if the money was for an "ass whooping," Oliver responded his source wanted him dead. (Tr. Vol. 5, 760). Multiple witnesses, including Shannon Boyer and Gerald Wayne Mills, testified about the joint involvement of Millsap and Oliver,

40

an indicted co-conspirator, in the methamphetamine conspiracy, which was significantly intertwined with the attempted murder and solicitations of murder of Hurley. (Tr. Vol. 4, 632- 636, 639-40, 782-88). The statements of Oliver, a co-conspirator, soliciting the murder of Hurley on behalf of Millsap were statements in furtherance of the conspiracy. *Young*, 753 F.3d at 771.

### 5. Enos

Paula Enos testified Shannon Spencer (Ferguson) told her one of the main topics for an upcoming NAE meeting was Kacie Lewis, who was associated with NAE, working with police because Enos and NAE members had been selling drugs to her and they believed Lewis "set up" NAE member Kevin Long. (Tr. Vol. 6, 1052-58). Enos, an associate of NAE, and Spencer, an NAE member, pled guilty to the RICO and methamphetamine conspiracies, as well as violence in aid of racketeering counts in relation to the kidnapping and assault of Lewis. (Tr. Vol. 6, 1034, 1045, 1303-07). Enos and Spencer testified they participated in the kidnapping and assault of Lewis, which was directly tied to NAE's retaliation against those who cooperate with law enforcement. (Tr. Vol. 6, 1056-58). Enos, Spencer, and Millsap were co-defendants in the RICO and methamphetamine conspiracies, and the referenced conversation furthered the conspiracy by bringing Enos into the kidnapping plot and provided background information to the jury about how Enos became involved.

41

Millsap's assertion that this evidence was intended to imply he was involved in the kidnapping is wrong. The evidence was presented to establish the continued pattern of racketeering activity by the enterprise, including the enterprise's consistent retaliation against those to cooperate.

### 6. Ferguson

Timothy Ferguson testified NAE members told him they beat him up as retaliation for cooperating with law enforcement against NAE. (Tr. Vol. 7, 1252-53). Ferguson, a WAR member and associate of NAE, pled guilty to the RICO and methamphetamine conspiracies, as well as violent crime in aid of racketeering counts. (Tr. Vol. 7, 1240-41, 1244, 1248, 1251). Like NAE, WAR forbids cooperating with law enforcement and physically retaliates against those who do. (Tr. Vol. 7, 1249-50). The evidence was offered to show its effect on Ferguson, which is not hearsay. *Wright*, 739 F.3d at 1170. However, even if offered for the truth of the matter, NAE members assaulting a witness and communicating the reason for the assault are statements of unindicted co-conspirators conveying a message to thwart further cooperation. *United States v. Arrington*, 867 F.2d 122, 130 (2d Cir. 1989).

Millsap's assertion that this evidence was intended to imply he was directly involved in the retaliation against Ferguson is wrong. The evidence was presented

42

to show the effect on the listener, and alternatively, to establish the continued pattern of racketeering activity by the enterprise, including the enterprise's consistent retaliation against those to cooperate.

### 7. Chandler

Robert Chandler testified he, Corey Ford, and Gullett were on their way to Millsap's house when police stopped Gullett and Ford, and Ford advised Chandler that they were delayed because they had to retrieve the bag carrying the methamphetamine. (Tr. Vol. 9, 1502-04). This statement was made in furtherance of the conspiracy to inform Chandler about developments and issues faced in the conspiracy, and the court did not abuse its discretion. *Darden*, 70 F.3d at 1529.

### 8. Facebook Posts

Facebook messages between indicted co-conspirator Troy Loadholt from November 17, 2016, and unindicted co-conspirator Kirk Banks, also known as Born or Borneallah Banks, to call Loadholt and that Banks was "gonna be pissed" were admitted at trial. (Tr. Vol. 10, 1754-69). Banks, a relative of Loadholt, was a security guard at Denny's, a California Denny's Federal Express account was used to ship multiple packages containing methamphetamine, and this post was made three days after law enforcement seized $40,140 sent from an address associated with Banks. (Tr. Vol. 10, 1641-44, 1692-98, 1753-55, 1769-71). The statements were made by

an indicted co-conspirator to an unindicted co-conspirator regarding seized drug money and were admissible.

Additional messages were admitted after it was well-established that Loadholt and Gullett were trafficking methamphetamine in the conspiracy with Millsap. In the messages, Loadholt asked if something was wrong, provided a phone number, and advised he wanted to see Gullett as soon as possible. (Tr. Vol. 10, 1761-62). Loadholt messaged Gullett about trying to collect "seven bands," referring to $7,000 and attempted to arrange a meeting. (Tr. Vol. 10, 1716, 1763-65). Loadholt told Gullett to "bring that banger with you," that he has "invested a lot more in you than a funky ass bike, though so just make it a priority to get with me," and "I'm glad you found or got a lead on what weak ass mother fucker robbed you." (Tr. Vol. 10, 1766-67). Gullett responded that he "went to Cali days ago," and they found the person who robbed him. (Tr. Vol. 10, 1767). Loadholt responded to bring the "banger," referring to a firearm, back to Loadholt's aunt's house, referring to indicted co-conspirator Darlene Walker, and later questioned whether he dropped it off and why he had not heard from him "about that six or anything else." (Tr. Vol. 10, 1732, 1768). Gullett responded that he needed his money and thought he was taking advantage of their friendship, to which Loadholt asked for an account to put the money in and he was in Long Beach. (Tr. Vol. 10, 1768-69). These statements were

44

between co-conspirators of Millsap and were in furtherance of the conspiracy as they involved collection of money, transmission of money, and firearms, a known tool of the drug trade.

Even if the district court erred in admitting these statements, any error was harmless. *Espinoza*, 684 F.3d at 781. "Criminal defendants are 'entitled to a fair trial, not a perfect one.'" *Darden*, 70 F.3d at 1530 (cleaned up).

### C.    Photographs

The district court properly exercised its discretion in denying Millsap's motions to exclude a photograph of Millsap performing the "Heil Hitler" salute with others, including NAE and WAR members and associates, in the Pope County Detention Facility in 2014, during the conspiracy period, finding that the probative value outweighed the "prejudicial impact" because it was consistent with the government's theory that Millsap is an associate of NAE, a white supremacist organization, and the charges required proof of an enterprise and Millsap's association. (R. Doc. 1700, 1743, 1754, 1927, 2159, 2178, 2208); *United States v. Crenshaw*, 359 F.3d 977, 991 (8th Cir. 2004). The district court also denied Millsap's motion to exclude evidence regarding his tattoos without prejudice and permitted the defendant to object at trial. (R. Doc. 2159, 2178, 2208).

Appellate Case: 23-2396    Page: 54    Date Filed: 01/17/2024 Entry ID: 5354081

During trial, multiple members of NAE testified about the Iron Cross and that the "Heil Hitler" salute was used within the organization. (Tr. Vol. 2, p. 267, 258, 285-86); (Tr. Vol. 5, 894); (Tr. Vol. 7, 1122, 1126); (Tr. Vol. 8, 1311). The district court again overruled Millsap's objection to the "Heil Hitler" photograph, finding that it was evidence of Millsap's association with NAE. (Tr. Vol. 2, p. 261-67).

Millsap stipulated to the admission of the photograph of his Iron Cross tattoo, Government's Exhibit 56. (Pretrial and Voir Dire Tr., Vol. 1, p. 3); (Tr. Vol. 10, p. 1793-94). Therefore, Millsap waived any challenge to the exhibit, and alternatively, he cannot establish plain error.

"A trial court has discretion to admit a relevant photograph unless it is 'so gruesome or inflammatory that its prejudicial impact substantially outweigh[s] its probative value.'" *United States v. Hester*, 140 F.3d 753, 759–60 (8th Cir. 1998). In *Hester*, a drug conspiracy case, this Court upheld admission of photographs of the defendant holding a child holding a handgun with a large platter of methamphetamine on the table finding the photograph relevant to the defendant's knowledge and role in the conspiracy, his claim to be a mere user, and his comfort handling large amounts of methamphetamine. *Id*. While acknowledging the "pictures are prejudicial because [defendant] allowed himself and his children to be

46

photographed in this context;" the Court found "they are not unfairly prejudicial and the probative value of the photographs outweighs the prejudicial effect." *Id.*

Here, the evidence admitted was intrinsic, and courts have routinely admitted evidence of other acts in RICO and VICAR cases to prove the existence, organization, and nature of a RICO and VICAR enterprise, along with the relationship and trust between the participants. *See United States v. Banks*, 514 F.3d 959, 977 (9th Cir. 2008). The government is "given considerable leeway" in offering such evidence for these purposes. *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000). If prior or other acts suggest criminal association between the conspirators, a trial court may admit evidence of the acts to rebut a claim that a defendant's association with the other conspirators was innocent. *United States v. Tse*, 375 F.3d 148, 155 (1st Cir. 2004).

In addition, "[g]ang-affiliation evidence may be highly probative of an individual's membership in a particular gang, so it 'has been held admissible, in cases where the interrelationship between people is a central issue.'" *United States v. Rios*, 830 F.3d 403, 421 (6th Cir. 2016). "The government may elicit testimony about the defendant's social or gang association if it is relevant to a disputed issue in the case." *United States v. Lemon*, 239 F.3d 968, 971 (8th Cir. 2001).

47

Millsap's association with NAE was a disputed issue, and the district court properly admitted the evidence because it supported elements of the offenses. *See, e.g., United States v. Gaines*, 859 F.3d 1128, 1132 (8th Cir. 2017) Moreover, any error in admitting the exhibits did not affect Millsap's substantial rights or have more than a slight influence on the verdict. As the United States argued in closing, even excluding all evidence of Millsap's tattoos, the evidence established Millsap's guilt. (Tr. Vol. 12, 2056).

## D.     Evidence of Hurley's Death

The district court denied Millsap's motion to exclude all reference to Hurley's death on May 2, 2016, without prejudice, noting Millsap may object at trial. (R. Doc. 2159, 2208). At trial, the United States alerted defense counsel and the court of its intention to elicit the fact that Hurley was killed to explain Hurley's absence at trial and that the case was still under investigation, as disclosed pretrial, but would limit the testimony to those two facts to avoid unnecessary prejudice. (Tr. Vol. 1, 62-64); (R. Doc. 2178). The court permitted that limited testimony and advised defense counsel could cross-examine on the issue and elicit testimony that others wanted Hurley dead. (Tr. Vol. 1, 64-69). Millsap cross-examined on others' motivations to kill Hurley and Hurley's prior bad acts. (Tr. Vol. 1, 83-88, 92, 98-101). Millsap

48

specifically elicited testimony that neither he nor anyone else had been charged with Hurley's murder. (Tr. Vol. 1, 91). Millsap did not request a limiting instruction.

The district court did not clearly abuse its discretion in admitting the limited testimony. Without such testimony, the jury would be left to speculate regarding Hurley's failure to testify about the attempt on his life and the controlled purchase of methamphetamine he conducted as to Millsap, with a significant risk that the jury would infer the testimony would have been unfavorable to the United States. If one party could "comment upon the absence of an opposing party's witness," particularly a witness who would be as material as Hurley to the attempted murder and methamphetamine distribution, "[i]t would present an anomaly in the law" if the United States "were not permitted to introduce evidence to excuse the absence of such witness." *See Schumacher v. United States*, 216 F.2d 780, 787–88 (8th Cir. 1954). Even if admission of the testimony was error, which it was not, it did not affect the defendant's substantial rights and did not influence the verdict. The testimony was clear that neither Millsap nor anyone else who might have a motive had been charged with the murder.

Appellate Case: 23-2396    Page: 58    Date Filed: 01/17/2024 Entry ID: 5354081

**IV.  The district court did not abuse its discretion by denying Millsap's motion for a mistrial.**

### A.    Standard of Review

The Court will affirm denial of a motion for a mistrial absent an abuse of discretion. *United States v. Wallette*, 686 F.3d 476, 482 (8th Cir. 2012) (citation omitted).

### B.    Discussion

The district court has "broad discretion to grant or deny a motion for mistrial because it is in a far better position to weigh the effect of any possible prejudice." *Id.* (citing *United States v. Diaz–Pellegaud*, 666 F.3d 492, 503 (8th Cir. 2012)).[7] "[A] defendant is . . . not entitled to a new trial unless the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." *Id.* (citation omitted).

Millsap argues he is entitled to a mistrial pursuant to *Remmer v. United States*, 347 U.S. 227, 229 (1954), because unauthorized private communications with jurors about matters pending for deliberation are presumptively prejudicial. First, claims of jury intimidation "based on nothing more than physical closeness, stares, and

---

[7] Millsap's reliance on *United States v. Gomez-Diaz*, 911 F.3d 931, 935 (8th Cir. 2018), is misplaced, as that case limited its analysis to the denial of a mistrial premised on prosecutorial misconduct during closing argument.

50

rebuffed efforts at conversation" do not trigger the *Remmer* presumption and such contacts "are neither unique nor uncommon to public trials." *United States v. Brown*, 923 F.2d 109, 111-12 (8th Cir. 1991). Millsap's speculative claims do not entitle him to a presumption of prejudice.

Further, Millsap fails to establish prejudice or that any actual or direct communication occurred between jurors and Christy Millsap as she drove down the street. *Id*. Christy Millsap's actions of sitting in a truck, looking at the jurors, and speeding off were not a "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury" that would trigger a presumption of prejudice. *Remmer*, 347 U.S. at 229. Jurors, who were admonished not to discuss the case with anyone and to report any instance of someone trying to talk to them about the case, reported no threat or attempt at communication by Christy Millsap. (Tr. Vol. 1, 12). There is no showing of prejudice or a miscarriage of justice, and the district court acted within its discretion by denying Millsap's motion for a mistrial.

51

## V.   The district court properly applied the challenged sentencing enhancements.

### A.   Standard of Review

This Court reviews factual determinations leading to application of a sentencing enhancement for clear error and reviews legal conclusions de novo. *United States v. Stone*, 325 F.3d 1030, 1031 (8th Cir. 2003) (citation omitted).

### B.   Firearm

United States Sentencing Guideline Section 2D1.1(b)(1) states that "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." The enhancement applies where the United States "can prove by a preponderance of the evidence that the defendant possessed [the weapon] while violating 21 U.S.C. § 841(b)." *United States v. Savage*, 414 F.3d 964, 966 (8th Cir. 2005). The weapon must be connected to the criminal activity for the enhancement to apply. *Id*. Although "mere presence" of the weapon is not sufficient for the enhancement to apply, it "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id*.

To meet its burden, "the Government need not show that a defendant used or even touched [the] weapon[.]" *Id*. at 967 (citation omitted). It is sufficient that the firearm be "readily accessible" during relevant conduct, as defined by U.S.S.G. §

52

1B1.2(a)(2). *Id*. The § 2D1.1(b)(1) enhancement is "a very low bar for the government to hurdle." *United States v. Anderson*, 618 F.3d 873, 882 (8th Cir. 2010). The nexus between drug-related activities and the firearm is established where the firearm was found in the same place where drugs or drug paraphernalia were located or where part of the conspiracy took place. *United States v. Atkins*, 250 F.3d 1203, 1214 (8th Cir. 2001).

In determining whether it is "clearly improbable" that the weapon was connected to the offense, the district court can consider that firearms are "tools of the drug trade[.]" *United States v. Renteria-Saldana*, 755 F.3d 856, 859 (8th Cir. 2014). For example, finding a loaded handgun at a stash house with drugs, whether or not the defendant personally used the firearm, is enough to show a connection between possession of the firearm and the drug trafficking offense, even when the defendant was not there at the time. *Id*. Actual or constructive possession is sufficient to satisfy § 2D1.1(b)(1). *Id.* The United States need not prove the defendant owned the weapon or the premises where the weapon was found. *United States v. Lopez*, 416 F.3d 713, 716 (8th Cir. 2005).

Here, the district court's application of the § 2D1.1(b)(1) enhancement was adequately supported by the credible testimony of multiple witnesses at trial. Former Pope County Sherriff's Office Investigator Chris Ridenhour testified that in 2016,

Appellate Case: 23-2396     Page: 62     Date Filed: 01/17/2024 Entry ID: 5354081

while Millsap was a fugitive on state charges, Millsap's wife arrived at their home in a truck, which had a backpack with men's clothing and roughly $12,000 in cash, ammunition, magazines, and a handgun in a briefcase. (Tr. Vol. 2, 183-84); (Sent. Tr., 8). (Tr. Vol. 2, 186). Millsap drove a truck. (Tr. Vol. 4, p. 586). Shannon Boyer testified that while at Millsap's house, she saw Millsap give Scotty Oliver a .45-caliber handgun on one occasion where Millsap said he was going to kill Hurley if Hurley caused him to get "busted" with methamphetamine, and on another occasion she and Oliver retrieved a five-gallon bucket of packaged methamphetamine from Millsap's house. (Tr. Vol. 4, 639-46). Despite Millsap's arguments to the contrary, the attempted murder of Hurley was connected to drug distribution. Additionally, Knox testified that Gullett had a firearm that he used in the attempted murder of Hurley, which was solicited by Millsap in connection with Millsap's drug trafficking activities. (Tr. Vol. 3, 328, 333-38); *United States v. Turpin*, 920 F.2d 1377, 1386 (8th Cir. 1990) (holding possession of a single gun supported enhancement for both defendants where it was reasonably foreseeable that one would possess a gun in furtherance of jointly undertaken criminal activity).

It was not clearly improbable that the guns were connected with the offense. The witnesses were subject to cross-examination and their credibility was assessed by the district court, which is virtually unassailable on appeal. *United States v.*

54

*Harris*, 493 F.3d 928, 930, 932 (8th Cir. 2007) (citation omitted). Further, "no facts take away from the inference created" by the proximity of guns, ammunition, cash, the defendant, and drug activity. *Lopez*, 416 F.3d at 716. The district court's "choice between two permissible views of the evidence is not clearly erroneous." *United States v. Byas*, 581 F.3d 723, 725 (8th Cir. 2009) (citation omitted). The district court did not clearly err by finding § 2D1.1(b)(1) applied.

### C.    Maintaining a Drug Premises

The guidelines call for a two-level enhancement "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). The enhancement "applies to a defendant who knowingly maintains a premises (*i.e.*, a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." § 2D1.1(b)(12), n. 17. "Among the factors a court considers in determining whether a defendant 'maintained' premises for drug distribution are (A) whether he or she owned or rented the premises, and (B) the extent to which he or she controlled access to, or activities at, the premises." *United States v. Miller*, 698 F.3d 699, 706 (8th Cir. 2012).

"Where the defendant lives in the house, this element is normally easily proved" and the enhancement applies "when a defendant uses the premises for the

purpose of substantial drug-trafficking activities, even if the premises was also [his] family home at the times in question." *Id.* at 706-07 (citation omitted). Even if there was no evidence of actual distribution from the home, "the commentary to § 2D1.1(b)(12) explicitly states that maintaining a premises for the purpose of drug distribution includes storage of the drugs." *United States v. Hernandez Lopez*, 24 F.4th 1205, 1208 (8th Cir. 2022).

Millsap concedes there was evidence of drugs being delivered to him at his home during the conspiracy but argues he did not intend to distribute the drugs. Multiple witnesses testified that they visited Millsap's house for transactions involving significant, distribution quantities of methamphetamine and that drugs were stored there. For example, Dustin Hurst, who lived with Millsap in 2015, testified he observed Gullett come to the house to buy or sell methamphetamine, including one instance involving three pounds, and Millsap showed Hurst the storage place for his methamphetamine under the stairs, which had a five-gallon bucket containing roughly 20 pounds of methamphetamine. (Tr. Vol. 4, 676, 681-84). Consistent with that testimony, Shannon Boyer testified that she went with Oliver, who sold methamphetamine for Millsap, to Millsap's house to obtain methamphetamine from Millsap and pay him, including one occasion where Oliver obtained five pounds of methamphetamine in a five-gallon bucket. (Tr. Vol. 4, 632,

56

636, 639-40). Joe Morris testified that he traded methamphetamine with Millsap at his house in Little Rock. (Tr. Vol. 4, 715).

Melissa Kizer testified that Gullett "always carried a black backpack" in which he kept drugs and money, she accompanied Gullett to Millsap's home where he took the backpack, she smoked methamphetamine at Millsap's house, and Gullett had her send a pound of methamphetamine with Chandler to Millsap's house. (Tr. Vol. 10, 1723, 1728, 1732-34). Corey Ford testified he had been to Millsap's house four or five times, including a trip with Chandler, who delivered a pound of methamphetamine to Millsap wrapped in a jacket. (Tr. Vol. 9, 1661, 1664). Chandler testified that he had seen approximately one pound of methamphetamine in a dresser in Millsap's bedroom. (Tr. Vol. 9, 1507-08). In 2015 or 2016, Brittany Gideon smoked methamphetamine at Millsap's house and observed Gullett take a black bag inside Millsap's house and return with a wallet that "wouldn't shut because it had so much money." (Tr. Vol. 3, 420-425). Dustin Cannon testified that he went to Millsap's house with Rusty Jones, who returned to the vehicle with methamphetamine. (Tr. Vol. 5, 877-78). Although the jury could infer Millsap continued to be involved in the distribution of methamphetamine through his wife after his incarceration, even excluding such evidence, the enhancement applied. (Tr. Vol. 6, 1066-73); (Tr. Vol. 8, 1448-51). As established through multiple witnesses,

57

Millsap conducted drug transactions and stored methamphetamine at his home, and the district court did not clearly err.

### D. Criminal History Points for Prior State Drug Convictions

Over Millsap's objection, the district court adopted the PSR, which assessed three points each for Millsap's 2015 and 2016 methamphetamine convictions. (PSR ¶ 68, 69; Sent. Tr. 14). Criminal history points are typically not applied for previous sentences that are part of the instant offense. U.S.S.G. § 4A1.2(a)(1) and comment. (n.1). However, § 2E1.1 applies to RICO convictions and presents an exception to this general rule.

Millsap fails to cite Application Note 4 to § 2E1.1, which explains that prior convictions forming "part of a 'pattern of racketeering activity'" can be "treat[ed] as a prior sentence under § 4A1.2(a)(1) and not as part of the instant offense" where the previously imposed sentence resulted from a conviction "prior to the last overt act of the instant offense[.]" Therefore, in RICO prosecutions, prior convictions can be used to increase a defendant's sentence even if they involve the same conduct underlying the RICO charge. *See United States v. Marrone*, 48 F.3d 735, 738–39 (3d Cir. 1995); *see also United States v. Haynie*, 75 F.4th 971, 974 (8th Cir. 2023). As the commentary makes clear, Application Note 4 ensures consistency with the rest of the guidelines.

Here, the state convictions at issue occurred in 2014 and 2016, before the last overt act of the instant offense, and the methamphetamine involved in the state convictions was not used to calculate the base offense level in Count Group Two. *See* PSR Addendum. The district court did not clearly err in assessing three criminal history points because each sentence exceeded one year and one month, and Millsap's argument is meritless. U.S.S.G. § 4A1.1.

## VI. The district court did not err by not applying U.S.S.G. § 5G1.3 to Millsap's undischarged term of imprisonment.

### A. Standard of Review

This Court reviews a district court's interpretation and application of the guidelines de novo and its factual findings for clear error. *United States v. Pierre*, 870 F.3d 845, 849 (8th Cir. 2017) (citation omitted). If a defendant "did not raise any arguments concerning section 5G1.3 below, [the Court will] review only for plain error." *United States v. Woods*, 717 F.3d 654, 657 (8th Cir. 2013) (citation omitted). "To prevail under plain error review, a defendant must show (1) error (2) that was plain and (3) affected the defendant's substantial rights." *Id.* (citation omitted).

59

**B.    Discussion**

Millsap contends the district court erred by failing to apply U.S.S.G. § 5G1.3. However, he did not request an adjustment under § 5G1.3(b); instead, Millsap asked the court to recommend credit for time served. (Sent. Tr. 18). The district court clarified that it was making the requested recommendation in its amended judgment, but that it did not intend to shorten Millsap's life sentence. (R. Doc. 2814, 2815). Thus, unlike *United States v. McKenzie*, 79 F.4th 924 (8th Cir. 2023), and *United States v. Winnick*, 954 F.3d 1103 (8th Cir. 2020), the district court did not express any intention of adjusting Millsap's sentence under § 5G1.3(b) to less than life imprisonment; rather, it expressly indicated it did not intend to shorten the life term imposed. (R. Doc. 2814).

Moreover, Millsap was ineligible for a § 5G1.3(b) reduction. Because Millsap committed part of the federal conspiracy offense "after sentencing for, but before commencing service of," the state offense in paragraph 68 of the PSR, "§ 5G1.3(a) applies, and § 5G1.3(b) does not." *United States v. Jones*, 195 F.3d 379, 383 (8th Cir. 1999). Millsap entered a conditional plea and was sentenced to 120 months' imprisonment on May 14, 2015, but was out on an appeal bond until his arrest on

60

June 22, 2016. (Government's Exhibits 105 and 106); (Tr. Vol. 1, 59-60; Tr. Vol. 8, 1489; Tr. Vol. 10, 1834).

Even assuming Millsap was eligible for an adjustment, the district court was aware of the details of Millsap's state sentences and § 5G1.3, as evidenced by its application of § 5G1.3(b) in co-defendants' cases, but opted not to apply an adjustment. (R. Doc. 2389, 2463, 2666); *United States v. Lomeli*, 596 F.3d 496, 504–05 (8th Cir. 2010). The district court appropriately considered the factors set forth in 18 U.S.C. § 3553(a). "[T]he guidelines are advisory, and section 5G1.3(b)(2) does not prohibit the district court from exercising its statutory authority[.]" *United States v. Benson*, 888 F.3d 1017, 1019-20 (8th Cir. 2018). There was no error, much less plain error, here.

## VII. The district court did not plainly err by considering Hurley's attempted murder at sentencing.

### A. Standard of Review

When a defendant fails to raise an objection to a purportedly improper factor at sentencing, plain error review applies. *United States v. Sadler*, 864 F.3d 902, 904 (8th Cir. 2017) (citation omitted). "Plain error is an error that is plain and that affects a defendant's substantial rights." *Id.* (citation omitted).

Appellate Case: 23-2396     Page: 70     Date Filed: 01/17/2024 Entry ID: 5354081

**B.      Discussion**

The record firmly contradicts Millsap's claim that the district court gave significant weight to Hurley's subsequent death in imposing a life sentence. At sentencing, the district court reviewed the testimony at trial, stating that "at some point Hurley ended up dead, but that has nothing to do with this." (Sent. Tr. 32). Both the district court and the United States reiterated that Hurley's subsequent death after his attempted murder was irrelevant. (Sent. Tr. 35-36). The district court recognized that "requesting somebody go out and murder a witness"—clearly referencing Millsap soliciting Hurley's murder and not the later actual murder—was a principal factor in its sentencing determination. (Sent. Tr. 42). The district court did not consider Hurley's later murder, and Millsap apparently did not believe the district court considered it because he did not object. (Sent. Tr. 42).

Even if the district court had considered the fact that Hurley was subsequently murdered, it would not have been improper. A sentencing court has broad discretion and may consider any relevant information that may assist it in selecting a fair and just sentence. *United States v. Hogue*, 66 F.4th 756, 764-65 (8th Cir. 2023) (citation omitted). A district court may base its sentence on uncharged relevant conduct as long the sentence does not exceed the statutory maximum for the offense of

62

conviction and factual findings are supported by a preponderance of the evidence. *Id*. Multiple witnesses testified that Millsap solicited Hurley's murder both before the murder attempt on January 4, 2016, and after. (Tr. Vol. 328, 333-35, 577-78, 586-91, 636, 719-22, 753-56, 761, 791-92, 827-34, 1347-48, 1500).

Millsap mischaracterizes the district court's statements. There was no plain error.

## VIII.  Millsap's claim regarding pretrial jail credit is moot.

On November 16, 2023, after Millsap filed his brief, the district court granted his motion to amend the judgment over the United States' objection. (R. Doc. 2810, 2813, 2814). The claim is moot. *See*, *e.g.*, *Prowse v. Payne*, 984 F.3d 700, 702 (8th Cir. 2021).

63

## **CONCLUSION**

For the foregoing reasons and citations to authority, this Court should affirm

Millsap's conviction and sentence.

Respectfully submitted,

JONATHAN D. ROSS
United States Attorney

By: */s/ Stephanie Mazzanti*
    Stephanie Mazzanti
    Bar No. 2006298
    Assistant United States Attorney
    P.O. Box 1229
    Little Rock, Arkansas 72203
    (501) 340-2600
    Stephanie.Mazzanti@usdoj.gov

64

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,996 words and the Court granted permission to file an overlength brief.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in size 14 in Times New Roman.

3.     This document has been scanned for viruses and is virus-free, in accordance with United States Court of Appeals for the Eighth Circuit Local Rule 28A(h).

*/s/ Stephanie Mazzanti*
Stephanie Mazzanti
Assistant U.S. Attorney
Bar Number 2006298
P.O. Box 1229
Little Rock, Arkansas 72203
(501)340-2600
Stephanie.Mazzanti@usdoj.gov

Appellate Case: 23-2396     Page: 74     Date Filed: 01/17/2024 Entry ID: 5354081

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this brief for review on January 17, 2024.

Michael Kiel Kaiser
Lassiter & Cassinelli
1218 West 6th Street
Little Rock, Arkansas 72201

/s/ Stephanie Mazzanti
Stephanie Mazzanti
Assistant U.S. Attorney
Bar Number 2006298
P.O. Box 1229
Little Rock, Arkansas 72203
(501)340-2600
Stephanie.Mazzanti@usdoj.gov